Mr. Berman, you can approach your argument any way you like, but having already sat through one argument, I will at least add that from my point of view, and not speaking for the whole panel, there are a few issues that I would appreciate it if you would be able to address. One is your view whether, assuming that the policy on its face was content neutral, whether it's narrowly tailored, consistent with the objectives of the government, or in light of the legitimate objectives of the government. Another issue is whether, in your position, there were ample channels for alternative speech. In addition to that, I don't mean to foreclose you from arguing that it's not content neutral if you want to, nor do I want to foreclose you from raising anything about whether, apart from the formal policy, something else was going on that raises an issue of fact that has to be reviewed as some implied policy. And then also, if you could address the significance of the emergency nature of the problems the City confronted, you would have covered the major issues of concern to me. I don't know if the other panel members would agree. I somehow doubt that. May it please the Court, Steve Berman on behalf of the plaintiffs. I guess I'd like to start with one big-picture point before we get to the questions that you asked. I'm here because I represent a proposed class of about 400 people who were, contrary to what Mr. Buck said, sitting peacefully in a public park four blocks away from the convention center where the delegates were housed. They were doing nothing wrong. There was no violence in the City of Seattle at the time they were arrested, and there was no decision in the 200 or 300 years of jurisprudence in this country that would have upheld the constitutionality. I gather they were within the zone. They were within the zone. The notion that they were somehow, if it was the City's policy to let them get close to the delegates, as we heard this morning, that's not borne out by the facts in this record, that they were four or five blocks from the delegates when they were arrested. Where I'd like to start is with your questions about Collins, Judge Gould, because when I took this case, I'll be frank, I believed I took the case because I thought Collins was on all fours, and I still do. And I want to address your exceptions that they noted. You know, I didn't say that they made those exceptions, but they reserved those. Yes. They did reserve those. And I think the fair question is whether we're within the parameters of those reservations. And I don't think we are, and here's why. First, they said we didn't address the question of whether there is, if there is widespread continuing violence, there could be a different rule. And the point I want to make, at least remand is in order, is that the record is clear, or at least there's an issue of fact, that on the morning of December 1st, 1999, when a no-protest zone was implemented, the, to use the words of the police commander at the time, quote, the downtown core is calm, and that's at ER 435. So in the morning, there is no continuing violence. To me, the words continuing violence mean it's happening right then. And we also know from Chief Joyner's testimony that continuing violence really wasn't the key to the no-protest zone. He testified, and that's at ER 333, that we would not have allowed peaceful protesters to stay because we could not be assured that the demonstration would remain peaceful. Now, he's not saying we're implementing this because of continuing violence. He's saying we're just so worried, we're anticipating violence, that's enough. And what the Collins case says, in my humble opinion of the case, is that that is not constitutional. Just because you have a hope, I mean a fear, or an anticipation of violence, that doesn't cut it. That's this case. Well, how about addressing this issue then? And certainly that, what you just said, can be argued from Collins. But how do you deal with the fact that the stakes in this case, in terms of the scope of the protest, and the stakes in this case, in terms of the persons who could be harmed, are much broader than in Collins? Well, I would answer that twofold. One is, I believe that that's an issue of fact, for the trier of fact. But second, if you read Collins, in all due respect, I'll point you to the passage and maybe you'll read it again and still disagree with me if you do. I'd be happy to read it dozens of times. At page 1367, the court says, San Francisco is host to a number of peaceful demonstrations. In addition to a large, not so peaceful demonstration, that led to a number of violent incidents. In addition, there were isolated incidents of looting and vandalism as well. That's at 1372. Right. That's this case. If you look at the record we've given you, and the mayor has admitted in his deposition testimony, that there was large, predominantly peaceful protests the day before, and there were several isolated incidents of violence and protest. But it wasn't just isolated incidents of violence. It doesn't seem from the record that it can be contested that there was a breakdown of order on the streets of Seattle. Well, I do contest that. You contest that? Because if you look at ER 366, it's the police after action report. It says that there's a disparity between how many people were actually violent. The ACLU observers say there were several dozen. The police say there were several hundred. And the author of the report said, we're talking about several hundred people. But how many people were overall on the streets of Seattle at that time? Thousands. There was thousands. And the city knew. Isn't it like tens of thousands? Tens of thousands. And the city knew there were tens of thousands. And the majority of those people, as the mayor has admitted, and the record shows, there was no problem with. It wasn't a breakdown of order. What about those that created the problem, though? What if they were, as has been alleged, so violent that you could have just a small, few number of people that are going to create a catastrophe? Well, under Collins, okay, I don't think that case is clearly on point, that your fear that that may happen is not. No, I'm not talking about fear. I'm talking about the evidence. If the evidence showed there was a group of people who were inciting this problem, and if it hadn't been for them, then this would have been, unequivocally, a peaceful protest. And I take it from the tenor of your question that if the city's unable to get to those people, then perhaps they're justified in what they did. And my answer to the question there. Sweeping more people within the ambit. And my answer to the question is twofold. If that's true, then it's unconstitutional as applied. Because my clients, who are sitting peacefully in that park, why would you be arresting them? There's no evidence in the record that they had to get the people behind them, that they were interfering with law enforcement activities. What about the fact, though, that these people were relatively disguised? So, although there are 400 people that were just there for civil disobedience, peaceful protest, the police officers were unable to identify those small groups, as they were, who were causing the violent problem. Well, I think the answer to that is twofold. Number one, Collins teaches us that it's very important to allow these kinds of activities to take place. And that you really can't engage in a prior restraint absent incipient violence, which they didn't have. Two, the record is also clear, on the day of the first implementation of the no protest zone, they had 800 new policemen there. They had policemen at any corner. You couldn't go to your office without policemen around you. It was, frankly, a little disarming being here. And they didn't even try to see whether those, that new troops could handle the situation. They just shut it down. That's the day the President was arriving, right? That's correct. I mean, No, they stayed throughout. With the President arriving, and with 130 delegates or so of foreign nations here, does the city have to gamble that the additional 800 or 1,000 policemen is going to maintain order? Well, I don't think, I think the city has to make some attempt, given the second day. You're saying the city can't act until there's another wave of violence? I think the city has to be on guard to see if they have things under control. But here- This is the Supreme Court of the United States, and every decision that I'm aware of. They don't give the police officers untrammeled right. But they certainly defer to them because this is a riotous situation. And no question, some types of police activity are going to constitute, as a matter of law, a violation of the First Amendment. But they do, the Supreme Court does, even the most liberal components of the Supreme Court. Does give great deference to police officers in this type of situation. Okay, let me take it to day two then, because I think this is a point that's been lost. Let's assume, Judge Gould, Judge Silver, that you had a concern, because of what happened on day one, that you might not be able to handle the next day. Okay. Okay, let's take us there. I don't agree with that, you understand? Right, I understand. But on day two of the no protest zone, and on day three of the no protest zone, there had been no violence in the city for over 36 hours. And I think the flaw in the city's policy is there was no reexamination. There was no attempt to say, you know, this is not as bad as we thought it was going to be, which is really what happened here. They didn't say, now we're going to open up a narrow avenue for people to be able to get access to the delegates. Now we're going to change this protest zone so people really can have First Amendment communications. They just left it the same. Yeah, well, they cut back on the scope of the zone after the President left. That's right. So they cut the western area out. But they still didn't- Still, they didn't totally reexamine the basic policies, what you're saying. Yes. Is there any precedent that would say, assuming, which, you know, we haven't decided, but assuming that they were entitled to set up that zone in the first place to keep order, that after a day of peace with that zone, they have to reevaluate? Yes, there is. And I believe it's the Bay Area Peace Navy case. And what that case says is there's a passage in the case that says, if as things go on, you find you need to modify the security zone either greater or lesser, you know, you can do that. And by inference, I think that given the protections that are afforded here, they have to do that. That leads me to address your second question, is whether the policies left open reasonable alternatives. And I think the answer to that is a resounding no under two cases, the United States v. Baugh and the Bay Area Peace Navy case. Because those cases have at their heart, if you distill them to one principle of law, it's that what's important is the Speaker can reach his or her, quote, intended audience from the imposed distance. There is no question here that under those two cases, the speakers here, I mean the protesters here, my clients, for example, were not afforded a reasonable means of communication. Four blocks away is not reasonable means. Who's their intended audience? The WTO. So your argument is that your clients aren't satisfied with communicating with the world via media or with the City of Seattle citizenry or the Federal or State officials. They want to present their points to the WTO. Well, yes, and there's reasons for that. If the media was a forum that was available, that was the answer to these situations, then there would never be a need to have protesters allow them in the public space that they haven't been allowed in, because the city could always say, we don't have to open it up. Just go to the news media. I think that would be a shocking departure from our personal. Of course, it's not always a crisis. Yes, I agree with that. The question here, it seems, is more that if you have a crisis that warrants some kind of emergency order and it's content neutral, then now we're looking at whether there are ample alternatives for speech. Well, one of the. Kind of in the light of that. I will. One of the things that you mentioned in an earlier question was why didn't they go protest somewhere else in the city? And to show you what I think one of the problems with that is, and if we're going to have supplemental briefing, maybe we'll get to that. A few months ago, with respect to the other half of this case that continued, the people arrested outside the no-protest zone, Judge Peckman issued an order of summary judgment in our favor that those people, hundreds of them, had also been arrested improperly. So when you say there were alternatives, some of these people, if they went outside the zone to protest, they were arrested. So it wasn't like there were all kinds of reasonable alternatives. Now, to address your question about whether because of exigent circumstances it's enough for the city to say go to the media, I'd say Collins says no. And there's no precedent for the suggestion that you can close off, because you're anticipating violence, close off that traditional First Amendment forum and send people to find a media outlet. Who knows if they're even going to have a media outlet? It's different. If I'm just one of my clients, for example, is a schoolteacher. She wanted to go see what was happening down here so she could tell her class. Is she going to have access to the media where she can raise her sign? Maybe, maybe not. But she certainly has access, if she's given access, to the WTO delegates where she could be there saying here I am, you're going by me, I want to say to you what I'm entitled under the Constitution to say to you, and that is I don't disagree with your environmental policy, whatever she wanted to say. They could not do that. She could be on the street, across the street from one of these hotels, I guess. Right? She could not have been. Well, like the no protest zone ended. Well, in some of the hotels, you're right, in some of the hotels, but not the site. So what you're doing is limiting her to the hopes that a couple of the delegates who happen to stay in the hotels near her, she could get to them. But that's not access to the body politic that she was interested or the other protesters were interested in. You don't disagree that there was violence? No, I don't disagree. Okay. And that it may have been such that it was so shrouded that the police officers couldn't identify precisely who was responsible for that violence. Do you agree with that? On that day of violence, yes. And it's still at your position that when that was spontaneous violence, that the police officers could not, the next day and the day after, ensure that it didn't occur again? That's right. Under the Collins case, because of our country's protection of the First Amendment, and... Well, how do we balance this, though? You agree that there was violence and that it wasn't appropriate. The police officers had the obligation to the public to ensure that didn't occur again. Where is the balancing in the First Amendment? Where – why is it the next day and the day after, they couldn't assume that there would be spontaneous violence by people they hadn't identified? Because I... Isn't that an important factor in determining what the policy should be? It is an important factor, but the Collins court decided this issue. They said it's not enough to anticipate. What they left open were two things that Judge Gould pointed out. One, if there's continuing violence, which there is no evidence that there was in this case, and two, is there reliable intelligence evidence that there might be violent activity, and there's no evidence in the record of this case... Reliable information that organized violence of a serious nature is about to occur. That's right. And there's nothing in the record to suggest that... No, because if that were the case, then the Collins case could not have come out the way it did. In Collins, what you're saying is they could have looked at day one and said that's intelligence that's going to happen in day two. The problem I have with Collins is just that the level of violence issues in that case are relatively trivial. I mean, they're trivial compared to the problems that Seattle faced, not that they wouldn't be important to the people involved. And that's not to say that the principles expressed there may not still control this case. But on its facts, Collins is different from this case, in my view, as the Forrest case the government relies on is so different from this case. So I'm not sure that the fact that it was argued by both sides really tell us what to do here. Well, then it seems to me the answer is, and picking up on your question, if that's the record, then there needs to be a remand, because there's all kinds of factual issues that you must know, I think, that decide these questions. Why don't you focus on that for just a moment, in terms of the questions that Judge Gould asked you at the beginning, that is, the alternative avenues of communication, whether it was narrowly tailored. So let's you've been addressing alternative avenues of communication. So what facts are in dispute that preclude a determination on the merits? Well, for one, it's the question that Judge Gould keeps coming back to, and that is the level of violence and what that level of violence was. There's a dispute on that. We say it was called, and that there is no record that they expected from reliable intelligence sources that there would be any violence in the next day. You're not advocating that you were entitled to summary judgment on this, on the constitutionality of the EO? Well, we did. And we still believe, and we put in our briefs, that we think it's unconstitutional on its face. But you're saying at least there's certainly, as you're urging it, there's an issue of fact whether there was a clear and present danger of imminent violence. That's right. And there's another issue of fact, and that is you asked me to address the order as applied. We submit that the order as applied, not on its face now, was unconstitutional because it was not content neutral. And by that I mean, and I think prior counsel touched on this, the order applied as it was applied to only one form of person in terms of exclusion, and that was anyone who was protesting the WTO. And as you've heard the evidence, it was summarized earlier this morning, that if you Now, that's unconstitutional as applied. I actually think that your position that that's the evidence as a matter of law here? In other words, the city has not offered any evidence to controvert that? Well, what the city has offered is that the evidence that the police were acting in a reasonable manner, that there were reasons that you have to decide, you know, one by one arrests, and that there was no policy to arrest everyone because they were wearing a button. And we think we've put enough evidence in that there's no genuine issue of fact on that, but the city says to the contrary, so there might be a genuine issue of fact. I don't really believe that that's the case. What's the significance, if any, of the fact that President Clinton was arriving in the middle of the night or the next morning? There are probably a few people in this courtroom who remember what happened in 1964 when something happened to President Kennedy. I mean, there's a risk of something happening to the President of the U.S. and 130 representatives of foreign nations. Doesn't the city have some duty to err on the side of caution? Well, but the city didn't put that in the record, and there's nothing in the record to suggest that was going on in Mayor Schell's mind or Chief Joyner's mind at the time, was that they were trying to protect the President. The only thing that's in the record justifying this emergency order is that they were trying to respond to the looting and vandalism and violence that they'd seen. Are you sure that it's not unfamiliar to you that when the President goes into any city, the Secret Service actually blocks off streets, blocks off all avenues to the vehicle as it's coming in, and is it your position that there's been no evidence of that offered by the city? Well, it answers both of your questions, because this may be something that we have to explore further if there's a remand. It's been my experience, and you've said it right, and I actually got to ride with President Clinton once and observe this, that when you land, the city and the government is completely out of it. The Secret Service doesn't want the city to be responsible for the President's safety. The President's people are responsible for his President's safety. So I think that the issue of the President's safety was being taken care of by the President and his people, not by the city. Well, it was only with the ancillary, and that's a statement made that's, I think, generous on your part. But they have to have the cooperation of the city police department. Otherwise, they could not in any way ensure that somebody got on a highway, either by vehicle or personally, to put the President in danger. Okay. If that was the city's real intent and concern, what about day two and three? The President's gone. If the concern was the safety of the President of the United States, which we all support, then day two or three, there's no justification. Well, there's a combination. Obviously, the concern they're stating is the concern to avoid a general anarchy and breakdown of order, as it relates to people who want to be downtown, the delegates to the convention, the life of the city. And that's at least a major significant governmental interest, whether the interests in protest are paramount to all the interests of the life of the city. Now, you know, that might be a strong First Amendment position, but it might not carry the day if the other interests are vital. Yes, but you asked me to respond to the present issue, and I say to you — Well, you would say those two purposes could coexist. Yes. Yeah. And I would also say, in terms of the intent of this policy, I do think it's important to focus on the length of the ban, because let's assume that you're right, that it was a tough thing for the city to balance First Amendment and violence. They just had a bad night the night before. I'll admit that. And they're trying to figure out what to do. So maybe day one, they oversweep, and they realize, you know, we went a little too far. Things are pretty quiet, which they were. By day two or three of this no protest zone, there's no support. There's no intelligence. There's no violence. The city's calmed down. People have learned to deal with this, yet they continued this ban. So I'm out of time, and I'll — Let me — let me — I still want to get back to Judge Gould's initial part of his question, which was the narrow tailoring. What facts do you contend are in dispute there, or do you contend on that issue there are no facts in dispute? I don't think there are any facts in dispute. There was not narrowly tailored ever. It was too wide. There was not an ability to communicate in a meaningful manner with the WTO delegates. And that's not narrow tailoring. They could have done all kinds of things to try to have communications. They could have set up a narrow corridor by which the WTO delegates got to and from the site, and people were allowed to be 75 feet, whatever the distance was within the case law, away. They didn't even try to do that. In opposition to the city's motion for summary judgment, did you argue that there were tribal issues of fact on narrow tailoring? We argued in our papers, yes. Okay. Thank you, Your Honor. Thank you. Mr. Buck, happy to hear from you again. Seems a little familiar. You were Judges 3, 4, and 5 to look at these issues. During WTO work a week, Judge Bryant at Tacoma took a look at it on the ACLU's motion for a restraining order. And he said, it seems to me that the city's going to prevail. So he denied it. That's not really before us right now, is it? It isn't. But Judge Rothstein Let's get to the issues that we've got in the record here. Was there an issue of fact before Judge Rothstein on whether this was narrowly tailored? Let's assume it's content neutral. Was there an issue of fact whether it was narrowly tailored? Is there an issue of fact whether there were alternative, ample alternative means of communication? What's the significance of the, you know, anarchy or chaos or crisis or emergency? The first thing I think, addressing something that Judge Paez said earlier, what exactly was argued below? First of all, Mr. Berman has stood here and said that there was no evidence that suggested there was ongoing violence. That's only true if you ignore everything that we put in the record. There is absolutely nothing, on the other hand, from the plaintiffs that say on Thursday, December 2nd, and Friday, December 3rd, there was no violence around the WTO. Because if they said that, it wouldn't be right. So is there an issue of fact as to whether there was ongoing problem with people clogging streets, vandalism, stuff being thrown at police officers? No, there's no issue of fact. The only facts are ours. That's in the record, then. That's in the record, Your Honor. So as far as that's concerned, no, there's no issue of fact. Now, are there material issues of dispute, in fact, with regard to whether this was narrowly tailored? I agree with Mr. Berman. There aren't any. Everybody knows exactly what happened out there. We know where the perimeter of the zone was. We know how it was staffed. We know what happened around the zone. But what about whether, were there issues of fact, whether some other kind of configuration would have, you know, provided security with a different level of communication for a minute? Your Honor, that is not this Court's decision to make. The Supreme Court has said that under the content-neutral test, it need not be the least restrictive. It needs only be something that advances the government's legitimate interest that would not be advanced without the restriction. That's in Turner v. the FCC and a number of other cases. So I think, again, let's take a look at what the case law from the Supreme Court in the Ninth Circuit has said about these issues. First of all, this idea that Collins prohibits you from doing anything based upon violence the day before, if that's the case, how did the Supreme Court okay Hill v. Colorado, where the statutory scheme was based solely upon the assumption that the abortion protesters were going to continue their illegal activities? What Collins says is ---- Reasonable assumption. What's that? Reasonable assumption.  Isn't there an issue of fact on that? No, Your Honor. There is no issue of fact, because that's not what Collins says. Even if there were an issue of fact, that's not what Collins says. What Collins says is you can't ban all protests in the entire city and county of San Francisco solely because there were isolated incidents of violence the day before. What Collins didn't say is if you've got substantial violence the day before, if you've got intelligence that suggests that tens of thousands of people are going to continue to come downtown and attempt to shut down the WTO, if you've got evidence that people are not able to get to their work, can't get to their doctor's offices, can't pick up their kids from daycare, that you can't do that. That's not what Collins says. All it says is if your only basis is a few acts of violence the day before, you can't close the entire city of San Francisco. To say anything more about Collins is to read it completely out of context. Now, let me ask you something. You know, the perimeter area, Mr. Berman was saying that his audience, his client's audience were members of the WTO, right? And they were at the hotels and they were at the convention center. That's right. If you take the perimeter and sort of look at it carefully, if they had stayed on this outside the perimeter or close to the perimeter, what's the closest they could have gotten to the convention center? Across the street. Across the street. And then that would be on what side? It's on the south side and the east side. South and east side? That's on the south side of the park. Well, it's changed since then. They've built some things around that. It's the freeway park and on the east side is the freeway park parking garage. And demonstrators could have gathered there? They were allowed to gather there. How can you gather in the garage there? There's a sidewalk right in front of it, Your Honor. I know, but it's awful narrow. Well, maybe that's not in the record. No judicial notice. It's not exactly a great protest venue. Particularly when Mr. Berman said he has 400 clients. Those 400, are they going to be able to protest all 400 at one time? Wouldn't there have to be some selectivity by the police officers as to who could be in that advantageous place? Absolutely not. And, in fact, if the police tried to make some decision as to who was going to be able to get up there in the front, that would be completely improper. But I'm actually following Judge Gould's position that on the sidewalk you're not going to be able to get 400 people. So some of those peaceful protesters are going to have to be excluded. Your Honor, there is no obligation in First Amendment jurisprudence in this country that a person be allowed to go to the specific person they want to talk to and talk to them face-to-face. The abortion rights protest cases give buffer zones of 100 feet in hill. That's far further away from the convention than the convention centers and the sidewalk were in this case. They didn't have the right to go in there and talk to them face-to-face. Service Employees v. Los Angeles, another excellent case. That was the Democratic National Convention case down at the Staple Center in L.A. The court there said 8 million square feet of zone set aside outside the Staple Center is largely okay. So you're telling me that, you know, on this little map that was attached to the order? Yes. It has a perimeter of the zone? Yes. You're telling me that I guess this is the east side of the convention center? East and south, Your Honor. East and south down here. And that there was enough area around here on the east side for 400 protesters to gather to be heard outside the zone? You could get 400 protesters on the sidewalk. They'd be spread down the sidewalk. But that really isn't the issue. Well, I'm talking about alternative avenues of communication. It's not just whether they can solely catch them at the entrance to the convention center. Where is the primary entrance to the convention center? Well, they're on the south and the north sides. On the north side, right? South and north. You know where the road goes underneath the convention center? That whole thing accesses you. Is that the primary entrance? Yes. Is there a dispute about that? There wasn't at the trial court level, Your Honor. So when service employees see that. You're telling me on this east side, and there's no dispute about this, 400 demonstrators could gather around the east side of the convention center, outside the zone, and adequately let their views be known to those who are entering from Pike? Let me put it to you this way, Your Honor. That was not an issue that was raised at the trial court. But if you take that. I'm talking about alternative avenues of communication. I understand that. And here's the way that I think is best to answer that. If you take the primary entrance to the convention center, which runs on the east side and down to the south side, it's about 75 yards long. There are doors all the way down it. If you do a straight line across the street and try to put 400 people on a sidewalk that is 75 yards long, I think you could do it. Okay. They might be tight. If people go in that garage, I'm trying to remember, if you pull into the garage, there's a little entrance into the garage. You go in the garage, you go around and around up to a certain floor, and then you don't go back walking out that entrance to cross the street. You go across, you're up there, and you enter the building that way, right? Mm-hmm. So where would people see these protesters if they're being driven up to that garage? Well, as they're walking back and forth within the convention center, that's all a glass wall, so they could see them certainly there. They can see them when they're coming out of their hotels because they're right across the street from their hotels. They can see them when they're going into the Paramount, which was another major venue for the WTO meetings. And in that case, they were allowed directly across the street. It looks like the zone was along Pike and Paramount. The Paramount is fairly close to Pike. Or Pine, I'm sorry, Pine. The Paramount was the zone allowed people to be on the entire length of the street, right across the street from the only entrance to the Paramount that I'm aware of, aside from the fire exit on the other side. How far from Pine? Is there any entrance to the convention center on Pike? On Pike? I'm sorry. The only side of the convention center that cannot be accessed that I'm aware of is the side that's bounded by the Eagles Auditorium. So that would be the west side. You can get in the north, east, and south side. Okay. Now, I think it's important, Ron, that we're talking about whether it's narrowly tailored, whether there are ample alternative means. Service employees versus Los Angeles dealt with this exact same thing. That's why I keep wanting to come back to it. The Democratic National Convention was meeting there. They set up this enormous zone, 8 million square feet around the Staples Center. There was one entrance into the Staples Center, and the designated protest zone was 260 yards away from it. Needless to say, the judge in that case didn't like that. He said, you've got to pull that in. Not only is it 260 yards away, but you've got the whole media camp between the protest area and where they go in. But the court also said, there is no question that you can set up a zone to allow the delegates safely to enter. So the court upheld the vast majority of this zone, even on sides that didn't touch on the actual entrance to the Staples Center, and upheld a place that delegates can get in safely. That's exactly what the city of Seattle did here. Your zone here is not one that just followed the Convention Center or the Paramount, which I realize you don't look at whether there were less onerous alternatives. But protesters who were down here on 4th, how far is 4th and Pike from the Convention Center? Two blocks. How many yards? I'd be guessing. Maybe 200 yards. It blocks about 100 yards, maybe. Okay. So there are other reasons. The point I'm trying to get to, though, on narrowly tailoring, and the reason that you're not supposed to be doing what you're doing right now with all due respect. No, I understand. I'm just trying to understand the zone and how it worked, because they've raised concerns about alternative avenues of communication. You're telling me that the protesters who were on the east side, outside the zone, along the sidewalk, possibly, you said, you think that they could have gathered there and have been heard. I know they could gather there. I guess it would depend on how the delegates entered the building as to whether they would actually be heard at that point. But since the delegates stayed in the downtown hotels, by and large, and since the hotels, every one of them except one, was bordered by the zone, by the city's intent, they wanted to get protesters close enough that their message could be heard. The people had the opportunity. It may not have been their first choice. It may not have been what they thought was the best choice. But the case law says specifically you don't get your first choice or your best choice as long as it's a reasonable restriction. Now, the first — Well, there's a dispute over whether it's reasonable. That's what the whole — that's what my question is. You know what? There's no disputed fact, though, Your Honor. At this point, it becomes a legal issue. The Frisbee case is a great example. Ban on residential picketing. It's a ban on residential picketing. The Supreme Court upheld it. Now, let's just say that there are reasonable alternatives that would be less restrictive than a complete ban on residential picketing. And the Court said there may have been. Right. All they have to show is that it achieved the goal of ending the evil better than it would have if they hadn't put the restriction in place. How can this Court then come back when the city took such great pains to get people to where they could actually be within voice contact of delegates, recognizing they don't have any right to go up and shove something in their face? That's never been a guaranteed right, as I think you would imagine. Well, what you're saying is that they could have done that as delegates left their hotels. As they entered the Paramount, which was a significant venue. As they entered the convention center. Any time they were out on the sidewalk, Your Honor, there were only two, I can't remember exactly. I think there were only three or four intersections inside the zone that are more than a block away from this. Now, you weren't here. No, I understand that. All I have is a map that, you know, the map of the zone I'm trying to look at. But the reality of the situation was you couldn't be anywhere in downtown Seattle and not know exactly what people were protesting about. This idea that is in the plaintiff's brief in this case, that you can't read a sign from across the street, well, let's say if that's the case, then there are a lot of people out there wasting money on advertising right now. So, is it narrowly tailored? Did it achieve the end to the evil that was sought? What was the evil that was being sought? Clear the streets so you can get an ambulance in there. Let delegates get to the convention center and to the Paramount and to their hotels. You know, that begs the question. Certainly, it solved the problem. The question is, did it constitutionally solve the problem? That's what we're looking at. The question is. You can't answer the question, which is the First Amendment question, by the resolution. Actually, Your Honor, the Turner case says you can. The Turner's case says as long as it achieves the end, that would be better than if there had been no restriction, it's okay. And the Supreme Court has specifically said. It's constitutional, though. Otherwise, you know, the end could be that it's, let's say, 10 miles away from the center. And certainly, that's going to achieve the end. But the question is, is it constitutional? It's the balancing. Your point, I agree with you completely, Your Honor, and that's part of the problem with Collins. You know, if Collins had been content neutral and had been over a couple block area, it would have been a very different case than if you declared 46.9 square miles of San Francisco off limits to protest. They certainly squelched the evil they were concerned about, along with a number of other evils. But compare that, compare the zone here, this gerrymandered mess. And remember, you have to keep in mind what's going on. You've got a limited number of police officers to maintain the perimeter. So it can't be something that is, that the perimeter is 10 miles long because you're weaving in and out around every building, and you expect the police department to have enough officers there to stop active protest groups who are coordinated by walkie-talkies and telephones. That's in the record. Whenever they see an opening, they get on the phone, get a hold of somebody who's got the other group, and pretty soon you've got a whole mass of people going to the weak spot. So that's part of what the Court has to consider. The city still went out of its way to give people the opportunity to get close to these delegates in the only way they could feasibly do it and maintain some semblance of order in the court. And, Your Honor, there is no way that we can justify calling this not narrowly tailored if you look at any of the other case law. Like Hill, 100 feet away from an abortion clinic. There weren't 10,000 people in front of that abortion clinic, clogging the streets, blocking the emergency vehicles, preventing people from giving their kids a daycare. There were a few rowdy protesters who were trying to keep people from going into the clinic. And 100 feet was approved by the Supreme Court with no evidence that anybody had ever been hurt, no evidence that property had been destroyed. How do you justify this claim that it's not legitimate or narrowly drawn? When you look at Boos v. Berry, which is the Supreme Court case that set up a 500-foot perimeter around foreign embassies. And the Court said it's legitimate for the city to say three or more people cannot assemble and go into that to protest in front of an embassy. The Supreme Court said that's okay. 500 feet is a lot further than across the street. And there was no evidence that there had been any violence, no evidence that there was a threat to the embassy personnel, no evidence that life was not going on as people usually lived it in that area. So if all those kinds of zones are okay, how on earth could this not be in the face of what the city had on its hands? Okay. Now, I do want to reference one other thing since I've got two minutes left, unless you want me to shut up. I'll take my time. You have 1 minute and 56 seconds. Great. This idea that certain people were allowed in and others were not is an absolute red herring. Take any – I challenge you. Find any case where the Supreme Court has said some restriction is okay. And find people who were not allowed in – or people that were allowed in versus people who were not. Take Hill. Obviously, the patients were allowed in. Take Schenck. Patients allowed in. Take the service employees, the people at the Democratic National Convention were allowed in, as were workers, as were their staff, as were media. That was okay. Any case – if this case fails because some people were allowed in that were necessary for the ongoing function of this part of the city, then the Supreme Court has been wrong a lot of times. You don't have to use your last 30 seconds if you don't want to. I'm sure there's something very, very important on here, Your Honor. We're not going to give you all an excuse to talk to us by post-argument briefing. You keep threatening that. I was hoping it would go away. No one's going to have to. There was an affidavit here by one of the – I guess. Maybe it was in the other case. I can't remember now. The cases just seem to blur together. But there was the affidavit by the individual who was in the zone, I think, who was handing out copies of – Thomas Selman. Copies of the Bill of Rights. Oh, no, that was – he was not actually in the zone, Your Honor. He approached the zone, according to his affidavit. Were there other ones who was in the zone handing out – A cartoon with a turtle on it. Right. And he was promptly escorted out of the zone. Yeah. He was arrested in the zone after a police officer said, you can do that outside the zone, you can't do it in. Why couldn't he do it inside the zone? Because the mayor's order said he couldn't. He wasn't – Where did the mayor's – I don't want to go over this again. The mayor's order said – Where did the mayor's order say he couldn't? The mayor's order said you can't be in the zone unless you live there, work there, have legitimate business to do according to the business of the city. I'm having déjà vu all over. Yeah, same here. We'll take your argument to be concluded. Thank you. Mr. Berman, if you need a minute of rebuttal, we'll give it to you, but – Just one minute. I know you're all tired, and I'll stick to that one minute. I appreciate your patience on this case, but I do believe it's an important case. The city – this policy was not contract neutral. I think I've made our point, and I don't know if you agree. If it's not, it has to be the least restrictive means of effectuating the city's goals. This map here, which there's been a lot of testimony today, which is not in the record from Mr. Buck, there was no way – Argument. Argument that you could protest from this little limited spot. This is a highway. I don't even know how, because we really didn't develop it in the record, that you would approach to get here, this narrow place. It's just – it's physically almost impossible, because this – Is that in the record? It's not in the record, nor was his argument in the record. I guess you could take judicial notice of the map if you could see the map.  Well, you have the map. You had it up. Right. And this is at ER 671. But more importantly – He said there's a sidewalk along there where 400 protesters could gather. Maybe. I kind of think it would be impossible to get to the sidewalk, because they blocked off the access to and from the area around the sidewalk, as I read the map. But more importantly, many delegates were staying at the Sheraton or at the Four Seasons or at the Hilton. They were not within sight of any protesters. This is actually fairly far away. If you were chanting or had a sign, you would not see it whatsoever. And lastly, there's no explanation in Mr. Buck's argument today, nor was there in the brief. On day two or three, where this public park is, where my clients were arrested for doing nothing, why? Why was that necessary? Your clients were up there. Where were they? Our clients were arrested up here at Westlake Park. Westlake Park. A big place where people come and talk about political issues in this city. Okay. Thank you, Your Honors. Okay. Thank you. Now, the case will be submitted, but if we ask for supplemental briefing, then we'll unsubmit it and resubmit it. We appreciate the excellent counsel and argument. Thank you.
judges: Gould, Paez, Silver